No. 24-7147, 24-7276, 24-7337

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

STATE OF ALASKA,
*Plaintiff/Appellee/Cross-Appellant*,

v.

NATIONAL MARINE FISHERIES SERVICE,
*Defendant/Appellant/Cross-Appellee*,

and

CENTER FOR BIOLOGICAL DIVERSITY,
*Intervenor-Defendant/Appellant/Cross-Appellee.*

On Appeal from the United States District Court for the District of Alaska
No. 3:22-cv-00032 (Hon. Sharon L. Gleason)

_____

**CENTER FOR BIOLOGICAL DIVERSITY'S
THIRD BRIEF ON CROSS-APPEAL**

_____

Kristen Monsell
Emily Jeffers
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7100
kmonsell@biologicaldivesity.org
ejeffers@biologicaldivesity.org

Marlee Goska
Center for Biological Diversity
P.O. Box 1178
Homer, AK 99603
(907) 931-4775
mgoska@biologicaldiversity.org

*Attorneys for Intervenor-Defendant/Appellant/Cross-Appellee
Center for Biological Diversity*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ............................................................................1

I.    NMFS Complied With the ESA in Designating the Specific
Areas That Contain Features Essential to the Conservation of
the Bearded and Ringed Seal ...............................................3

    A.    The Designations Contain the Features Essential to the
Seals' Conservation As the ESA Requires ..................................4

    B.    Alaska's Demands for Greater Specificity In
Designating "Specific Areas" Is at Odds with the ESA ..........11

II.    The ESA Does Not Require Consideration of Foreign
Conservation Efforts When Designating Critical Habitat, and
the District Court Erred When It Imposed This Requirement ...........15

III.    NMFS Properly Considered Economic Impacts .................................19

IV.    The ESA Does Not Require an Explicit Prudency Finding ...............24

CONCLUSION ..........................................................................29

CERTIFICATE OF COMPLIANCE ......................................................31

# TABLE OF AUTHORITIES

**Cases**

*Alaska Oil & Gas Ass'n v. Pritzker*,
840 F.3d 671 (9th Cir. 2016) ..................................................................17

*Alaska Oil & Gas Ass'n v. Ross*,
722 Fed. App'x 666 (9th Cir. 2018) ......................................................17

*Alaska Oil & Gas Ass'n v. Salazar*,
916 F. Supp. 2d 974 (D. Alaska 2013) ..................................................27

*Alaska Oil & Gas Ass'n v. Jewell*,
815 F.3d 554 (9th Cir. 2016) ................................... 8, 9, 11, 12, 13, 14, 15, 22, 26

*Ariz. Cattle Growers' Ass'n v. Salazar*,
606 F.3d 1160 (9th Cir. 2009).........................................................7, 14

*Ariz. Cattle Growers' Ass'n v. Kempthorne*,
534 F. Supp. 2d 1013 (D. Ariz. 2008) ....................................................4

*Bennett v. Spear*,
520 U.S. 154 (1997) ...............................................................................26

*Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Com.*,
792 F.3d 1027 (9th Cir. 2015) ..................................................... 21, 22

*California v. Norton*,
311 F.3d 1162 (9th Cir. 2002)................................................................10

*City & Cnty. of S.F. v. EPA*,
145 S. Ct. 704 (2025) .............................................................................16

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
450 F.3d 930 (9th Cir. 2006) ................................................................26

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
67 F.4th 1027 (9th Cir. 2023) ...........................................................8, 10

ii

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*,
   616 F.3d 983 (9th Cir. 2010) ........................................................ 6, 7, 21

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ...............................................................18

*Middle Rio Grande Conservancy Dist. v. Babbit*,
   206 F. Supp. 2d 1156 (D.N.M. 2000) ....................................................9

*Nat. Res. Def. Council v. U.S. Dep't of Interior*,
   113 F.3d 1121 (9th Cir. 1997) ................................................ 24, 27, 28

*Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*,
   551 U.S. 644 (2007) ......................................................................7, 27

*Or. Nat. Res. Council v. Thomas*,
   92 F.3d 792 (9th Cir. 1996) ................................................................17

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   586 U.S. 9 (2018) ................................................................. 9, 10, 20

**Statutes**

1 U.S.C. § 1 .........................................................................................11

16 U.S.C. § 1531(b) ............................................................................23

16 U.S.C. § 1532(3) ..................................................................... 23, 24

16 U.S.C. § 1532(5)(A) .......................................................................11

16 U.S.C. § 1532(5)(A)(i) ............................................................ 4, 24, 26

16 U.S.C. § 1532(5)(A)(ii) ....................................................................6

16 U.S.C. § 1533(a)(3)(A) ............................................................11, 23, 24

16 U.S.C. § 1533(a)(3)(A)(i) ......................................................... 22, 25, 26

16 U.S.C. § 1533(b)(1)(A) .......................................................... 16, 18

16 U.S.C. § 1533(b)(2)........................... 2, 11, 12, 15, 16, 18, 19, 20, 21, 22, 23, 24

16 U.S.C. § 1533(b)(6)(C)(ii) ...................................................... 22, 26

**Regulations***

50 C.F.R. § 424.02 ...............................................................................13

50 C.F.R. § 424.12(a) ..........................................................................26

50 C.F.R. § 424.12(a)(1) ........................................................... 25, 26, 28

50 C.F.R. § 424.12(b)(1)(ii) ................................................................13

50 C.F.R. § 424.12(e)..........................................................................10

50 C.F.R. § 424.19(b)..........................................................................23

**Federal Register Notices**

84 Fed. Reg. 45,020 (Aug. 27, 2019)................................................. 28, 29

**Legislative History**

H.R. Rep. No. 95-1625 (1978),
   *as reprinted in* 1978 U.S.C.C.A.N. 9453 ............................................22

*All regulations refer to those in effect in April 2022, when NMFS issued its critical habitat determinations.

iv

# INTRODUCTION

The National Marine Fisheries Service's (NMFS) critical habitat designations for the Beringia distinct population segment of the Pacific bearded seal ("bearded seal") and the Arctic ringed seal ("ringed seal") comply with the Endangered Species Act (ESA) in all respects, and this Court should uphold NMFS's well-reasoned decision. None of Alaska's contrary arguments are supported by the facts or the law. Indeed, each of Alaska's arguments read requirements into the ESA that do not exist, running afoul of fundamental notions of statutory construction in the process. *See generally* Alaska's Principal and Resp. Br. (AK Br.), Dkt. No. 32.[1]

First, despite acknowledging that the standard for designating occupied critical habitat is distinct from, and less demanding than, the standard for designating unoccupied critical habitat, *see, e.g., id.* at 41–42, Alaska repeats the district court's errors in arguing that NMFS failed to explain why the designated areas are essential for the conservation of the bearded and ringed seal. That is the standard for designating *unoccupied* critical habitat and is inapplicable here where NMFS designated *occupied* habitat only. NMFS provided the explanation the ESA requires: how the designated areas contain the physical and biological features essential for the seals' conservation.

---

[1] Citations to all briefs reference the original page numbers.

Second, Alaska takes advantage of the seals' life history characteristics—their large ranges and reliance on ever-changing sea ice—to assert that the specific areas NMFS designated as critical habitat are not specific enough. *Id.* at 34–36, 50–51. But, as NMFS explained in issuing its decisions, the best available science does not allow for greater specificity, and Alaska's demands for it are inconsistent with the statute and numerous decisions from this Court.

Third, Alaska accuses the Center for Biological Diversity ("Center") of attacking a "strawman" in arguing that the district court improperly held the ESA requires NMFS to consider foreign conservation efforts in designating critical habitat. *Id*. at 54–56. But this is precisely what the district court held. This holding—that foreign conservation efforts are a relevant factor for the agency's decisions under review—confuses the standards for designating critical habitat with that of listing a species in the first place. If Congress had intended NMFS to consider such efforts in critical habitat designations, it would have said so.

Fourth, Alaska misinterprets Section 4(b)(2) by conflating the mandatory evaluation of economic impacts when designating critical habitat with the discretionary decision to consider excluding an area and attendant weighing of costs and benefits. *Id*. at 59–67. This Court has held that NMFS has wide discretion in how it "tak[es] into consideration," 16 U.S.C. § 1533(b)(2), the economic impacts of critical habitat designations, and NMFS is not, as Alaska

argues, required to weigh the costs and benefits of the areas Alaska requested to be excluded from the designations.

Finally, Alaska's insistence that the ESA requires NMFS to have explicitly determined that designating critical habitat for the bearded and ringed seal is prudent, AK Br. 67–71, is at odds with the ESA. The district court rightly rejected Alaska's arguments on this issue, recognizing that they reflect little more than disagreement with the agency's decisions (including NMFS's explanations of the benefits that such designations would provide to the seals) and Congress's directive that NMFS designate critical habitat for listed species.

As such, this Court should reject Alaska's claims and uphold the designations in all respects.

## I. NMFS Complied With the ESA in Designating the Specific Areas That Contain Features Essential to the Conservation of the Bearded and Ringed Seal

NMFS's critical habitat designations comply with the ESA. In arguing otherwise, Alaska improperly (1) conflates the more demanding standard for designating unoccupied habitat with that of occupied habitat; and (2) insists on a greater level of scientific proof than the best available science can provide. In issuing the designations, NMFS demonstrated how the areas it specified contain the physical and biological features essential to the seals' conservation. That is all the ESA requires.

## A. The Designations Contain the Features Essential to the Seals' Conservation As the ESA Requires

NMFS's critical habitat designations are consistent with the ESA's plain language, as they contain the features that are "essential"—i.e., "necessary" or "more than convenient or helpful"—to the conservation of bearded and ringed seals. *Contra* AK Br. 31 (citation omitted). In arguing that the designations are too large because they are not limited to the "'specific areas' that are 'essential' to the species' conservation," AK Br. 29, Alaska misreads the ESA.

The statute defines critical habitat, in pertinent part, as "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). In this context, "essential to the conservation of the species" modifies "physical or biological features," *see id.*, "not the phrase 'specific areas,' which appears earlier in the sentence," *Ariz. Cattle Growers' Ass'n v. Kempthorne*, 534 F. Supp. 2d 1013, 1031 (D. Ariz. 2008) (holding the same for "special management considerations"), *aff'd*, 606 F.3d 1160 (9th Cir. 2010). Thus, "the statute does not require anything more than a finding that the physical and biological features *themselves*, not the [designated areas]," are essential to the species' conservation. *Ariz. Cattle Growers v. Kempthorne*, 534 F. Supp. 2d at 1031; *contra* AK Br. 40. That is just what NMFS did. *See* Center for Biological

4

Diversity's First Br. on Cross Appeal 12–24, Dkt. No. 27 (Ctr. First Br.) (detailing NMFS's explanation of how the best available science shows that each of the designated areas contain the features essential to the conservation of the bearded and ringed seal).

That the designations encompass large areas does not mean they do not contain the features "essential" to the seals' conservation. *Contra* AK Br. 31–32. As NMFS explained, "specific areas are eligible for designation" as occupied critical habitat "if, based on the best scientific data available, [they] … contain[] one or more of the physical or biological features essential to the conservation of the species and that may require special management considerations or protection." 2-FedER-051, 105–06. And nothing in the ESA's critical habitat definition or NMFS's regulations "restrict critical habitat to only the most important core habitats of the species." 2-FedER-051, 106. Moreover, "where, as here, one or more essential features are not static, and their location changes both seasonally and annually, [the] critical habitat designation[s] must be large enough to account for such changes in the locations of essential features and the particular species' habitat requirements throughout their life history." 2-FedER-051, 106. Accordingly, the agency identified the "specific area that comprises parts of the Bering, Chukchi, and Beaufort seas as critical habitat, within which all of the identified essential features can be found in any given year." 2-FedER-031, 083.

Alaska's reliance on legislative history commenting on a critical habitat designation for the grizzly bear, AK Br. 32–33, is therefore misplaced. In designating the critical habitats at issue here, NMFS did not conclude the designations would be "just beneficial or helpful" to the seals. *Contra id.* (citation omitted). Rather, NMFS explained how and why the designated areas contain the features essential to the seals' conservation.

Alaska ignores the agency's extensive explanations and instead repeatedly asserts that NMFS failed to explain why the designated areas are essential to the species' conservation. *Id.* at 33, 34, 38, 39–41. But that is not the relevant question when designating *occupied* critical habitat. Alaska's argument relies on the standard for designating *unoccupied* critical habitat, which—in contrast to designating *occupied* critical habitat—means the "specific areas" determined to be "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii); *see also Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 616 F.3d 983, 990 (9th Cir. 2010) (explaining that whether the designated areas are essential for the species conservation "is the standard for unoccupied habitat, … and is a more demanding standard than that of occupied critical habitat" (citation omitted)).

Alaska's attempts to conflate the ESA's distinct requirements for designating unoccupied habitat with that of occupied habitat are contrary to the statute's plain language. Indeed, this Court has repeatedly recognized this distinction and rejected

arguments that would have conflated the two standards. *See* Ctr. First Br. 24–25 (explaining how the two standards are distinct and citing relevant cases).

Alaska fails in its effort to distinguish these cases. It claims, for example, that *Arizona Cattle Growers' Association v. Salazar*, 606 F.3d 1160 (9th Cir. 2009), is irrelevant because it did not involve "the requirements for designating occupied areas" or hold "that occupied areas … need to be essential to the conservation of the species," AK Br. 23, 43. But in that case, this Court explicitly recognized that the standard for designating unoccupied critical habitat is "more onerous" because it requires NMFS "to make a showing that unoccupied areas are essential for the conservation of the species." *Ariz. Cattle Growers v. Salazar*, 606 F.3d at 1163.

By arguing that NMFS's designations for occupied critical habitat are unlawful because the agency failed to show that the designations are essential to the seals' conservation, Alaska (and the district court) improperly hold NMFS to the "more onerous" standard. *See id.*; *see also Home Builders v. FWS*, 616 F.3d at 990 ("Essential for conservation is the standard for unoccupied habitat ….") (citation omitted). But courts cannot endorse statutory interpretations that "add[] an additional criterion" to a statutory process or "raise[] that [statutory] floor" for an agency decision. *Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*, 551 U.S. 644, 663–64 (2007). Yet that is just what the district court did and what Alaska asks this Court to do.

*Center for Biological Diversity v. U.S. Fish and Wildlife Service*, 67 F.4th 1027 (9th Cir. 2023) [hereinafter *CBD v. FWS*], is also inapposite. There, the Ninth Circuit based the part of its decision on which Alaska relies, AK Br. 33 (regarding the designation of Subunit 4b of jaguar critical habitat), on the fact that, in designating *unoccupied* critical habitat, the Fish and Wildlife Service (FWS) "designated a separate corridor that provides the same connectivity function as Subunit 4b" as well as "the complete absence of evidence that jaguars have ever used Subunit 4b" as a migratory corridor "or for any other purpose," *CBD v. FWS*, 67 F.4th at 1046 (emphasis omitted).

Here, the record is replete with evidence that bearded and ringed seals cannot perform their essential life functions in other areas without adequate sea ice and prey, and that they use the designated areas for the precise purposes for which they were designated: whelping and nursing pups, molting, and as a platform from which to hunt. *E.g.*, 2-FedER-029–30, 80–82; *see also* Ctr. First Br. 25–26 (explaining how the district court misread *CBD v. FWS*).[2]

---

[2] As NMFS pointed out in its opening brief, NMFS Principal Br. 17, Dkt. 21, the district court also misread this Court's decision in *Alaska Oil and Gas Association v. Jewell*, 815 F.3d 554 (9th Cir. 2016) [hereinafter *Jewell*]. When the district court cited *Jewell* for the proposition that agencies must prove "that the [designated] area is critical to the future recovery and conservation of the species," 1-FedER-009 (citation omitted), it mistakenly quoted this Court's summary of the parties' various positions. *Jewell*, 815 F.3d at 550. *Jewell's* actual holding was that "[t]he district court erroneously focused on the areas existing polar bears have been shown to

Nor is *Middle Rio Grande Conservancy District v. Babbit*, 206 F. Supp. 2d 1156 (D.N.M. 2000), on point. *Contra* AK Br. 33–34. In that case, the court held that FWS's identification of essential habitat features, which FWS described as "water of sufficient quality … [and] quantity," was insufficient because such findings were "vague generalities that state little more than what is required for any fish species." *Middle Rio Grande*, 206 F. Supp. 2d at 1184–85 (citation omitted). Here, in contrast, NMFS did not just simply identify "sea ice of sufficient quantity" as an essential habitat feature. Rather, the agency specified the particular characteristics of sea ice and snow cover necessary to support specific life functions. *See, e.g.*, 2-FedER-081, 130 (defining sea ice habitat for ringed seal molting "as areas containing sea ice of 15 percent or more concentration in waters 3 [meters] or more in depth (relative to [mean lower low water])"); 2-FedER-029, 074 (defining sea ice habitat for bearded seal whelping and nursing "as areas with waters 200 [meters] or less in depth containing pack ice of at least 25 percent concentration and providing bearded seals access to those waters from the ice"); *see also* Ctr. First Br. 13–14 (describing other specific definitions).

*Weyerhaeuser Co. v. U.S. Fish and Wildlife Service*, 586 U.S. 9 (2018), does not offer support for Alaska's arguments either. *Contra* AK Br. 22, 36–38. In the

---

utilize rather than *the features* necessary for future species protection." *Jewell*, 815 F.3d at 561 (emphasis added) (citations omitted).

relevant language from *Weyerhaeuser*, the Court was paraphrasing the ESA's critical habitat definition to highlight how it is distinct from the standalone term "habitat." 586 U.S. at 19–20; *see* Ctr. First Br. 26–27. The Court was not imposing an additional requirement that NMFS must meet before designating critical habitat, and the ESA's requirements for designating critical habitat were not at issue in that case. *See Weyerhaeuser*, 586 U.S. 9, 20; Ctr. First Br. 26–27.

Alaska also raises a novel, and ultimately irrelevant, argument that a regulation in effect when the ice seals' critical habitats were designated imposed an additional requirement. AK Br. 38–39 (citing *CBD v. FWS*, 67 F.4th at 1040–42). This now-repealed regulatory language required NMFS, when designating unoccupied critical habitat, to first show that designated occupied critical habitat would be inadequate to ensure the conservation of the species. 50 C.F.R. § 424.12(e) (2022).[3] But the agency did not designate unoccupied critical habitat for either of the ice seals and so was not required to make this showing.

Nor does NMFS's reasoning to exclude 30 million acres from the ringed seal's critical habitat designation due to national security concerns undermine the designations. *See* AK Br. 40 (citing 2-FedER-093); *see also id.* at 31, n.8 (citing 2-

---

[3] As with the Center's first cross appeal brief, all regulations cited refer to those in effect in April 2022, when NMFS issued its critical habitat determinations. *See California v. Norton*, 311 F.3d 1162, 1167 n.2 (9th Cir. 2002) (relying on regulations in place at the time of the agency's decision).

FedER-092–93). NMFS excluded these areas at the U.S. Navy's request and only after conducting an exclusion analysis pursuant to Section 4(b)(2), 16 U.S.C. § 1533(b)(2), concluding "that the benefits of excluding this particular area due to national security impacts outweigh the benefits of designating this area as critical habitat for the Arctic ringed seal," 2-FedER-092–93. NMFS did not make this determination, as Alaska implies, AK Br. 40, because the area lacks features essential to the conservation of the species.

## B. Alaska's Demands for Greater Specificity In Designating "Specific Areas" Is at Odds with the ESA

Alaska also incorrectly claims the designations run afoul of the ESA's requirement to identify the "specific areas" that contain the features necessary for the seals' conservation. *See* AK Br. 34–36, 50–51. Alaska's argument "demand[s] greater scientific specificity than available data could provide," *Jewell*, 815 F.3d at 558, and this Court should reject it.[4]

---

[4] To the extent Alaska's argument is that NMFS cannot designate one specific area as critical habitat because the ESA refers to the designation of "specific areas" in the plural, that argument also fails. Nothing in the definition of critical habitat, 16 U.S.C. § 1532(5)(A), the requirement that NMFS designate critical habitat, *id*. § 1533(a)(3)(A), (b)(2), or any other provision of the ESA indicates that Congress intended to prohibit NMFS from designating a single specific area as critical habitat, *see* 1 U.S.C. § 1 (instructing that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise … words importing the plural include the singular").

Alaska "cannot point to evidence that [NMFS] failed to consider, or demonstrate that [NMFS's] stated reasons are irrational or unsupported by the record." *Id.* at 562. Instead, Alaska again points to the overall size of the designations, "disagree[ing] with the scope of [NMFS's] designation[s] of critical habitat." *Id.* This is insufficient to overturn NMFS's decision, which "drew rational conclusions from the best available scientific data" as the ESA requires. *Id.* (citing 16 U.S.C. § 1533(b)(2)).

In issuing both designations, NMFS explained that the specific locations of the seals' essential sea ice habitat "vary from year to year, or even day to day, depending on many factors, including time of year, local weather," "and oceanographic conditions." 2-FedER-031, 083 (citing studies). Specifically, NMFS explained how the "the duration that sea ice habitat essential for whelping and nursing, or for molting, is present in any given location can vary annually depending on the rate of ice melt and other factors," 2-FedER-031, 083 (similar), and that "[s]nowdrift depths on sea ice are also spatiotemporally variable, as drifting of snow is determined by characteristics of the ice, such as surface topography and weather conditions (*e.g.*, wind speed/direction and snowfall amounts), among other factors," 2-FedER-083 (citing study).

Because of the "dynamic nature" of this habitat and the "spatial and temporal variations in sea ice cover" (and on-ice snow cover in the case of ringed

seals), NMFS could not "map precisely the specific geographic locations where the sea ice essential features occur." 2-FedER-031, 083. Moreover, the "temporal overlap" of the seals' essential behaviors, such as the overlap of molting with whelping and nursing, "also makes it impracticable to separately identify specific areas where each of these essential features occur." 2-FedER-031, 083. Accordingly, for each designation, NMFS designated "a single specific area that contains all three of the identified essential features." 2-FedER-034, 085; *see also* 2-FedER-051, 106 (NMFS identified the areas "with as much specificity as the best scientific data available allows.").

NMFS's approach is fully consistent with the ESA and its best available science mandate. *See, e.g.*, *Jewell*, 815 F.3d at 556 ("The [ESA] contemplates the inclusion of areas that contain [elements] essential for occupation by the polar bear, even if there is no available evidence documenting current activity."). It is also fully consistent with the agency's regulations that define the "[g]eographical area occupied by the species" to include "seasonal habitats, and habitats used periodically," and define essential "features" to "include habitat characteristics that support ephemeral or dynamic habitat conditions." 50 C.F.R. § 424.02; *see also id.* § 424.12(b)(1)(ii) (instructing NMFS to "[i]dentify" essential features "at an appropriate level of specificity using the best available scientific data," which "may include consideration of the appropriate quality, quantity, and spatial and

13

temporal arrangements of such features in the context of the life history, status, and conservation needs of the species").

Alaska argues that upholding NMFS's designation here would lead to "absurd results" by allowing NMFS to "get away with designating all occupied areas with water for an endangered fish or all occupied areas with trees for an endangered bird," AK Br. 39–40, but this ignores that—unlike water in a river and trees in a forest—sea ice is dynamic and constantly changing. It also ignores the agency's extensive explanations as to why more specificity was not possible in this instance, given the species' wide ranges and use of particular habitat areas based on a variety of changing conditions.

Alaska's demands for more specific designations are at odds with the ESA's requirement that NMFS base critical habitat designations on the best *available* science, not science that does not exist. This Court has repeatedly recognized as much in rejecting demands for greater specificity, including in Alaska's and other plaintiffs' challenge to FWS's designation of critical habitat for the polar bear. *See Jewell*, 815 F.3d at 557–58 (rejecting the plaintiffs' arguments that FWS could only designate polar bear denning habitat if the agency first "identif[ied] specifically where, within that area, all … elements of the [essential denning habitat feature] were located"); *see also Ariz. Cattle Growers v. Salazar*, 606 F.3d at 1163–66 ("Limiting the agency to designating habitat only where the owl 'resides' focuses

too narrowly on owl survival and ignores the broader purpose of the critical habitat designation," and a more restricted interpretation "would make little sense as applied to nonterritorial, mobile, or migratory animals … for which it may be impossible to fix a determinate area in which the animal 'resides.'").

Alaska's attempt to distinguish *Jewell* by pointing to how the designation at issue there was smaller and that FWS based the designation on "scientific studies and other information, including radio-telemetry data of female bear movements," AK Br. 44–45 (citation omitted), also falls flat. As NMFS explained in its decisions, the agency determined that the designated areas contain essential habitat features based on numerous surveys and other scientific evidence, including aerial surveys and data that tracked the movements of tagged seals. *See, e.g.*, 2-FedER-026–28, 077–79. As with FWS's decision in *Jewell*, here, NMFS "drew rational conclusions from the best available scientific data, which is what the [ESA] requires." *Jewell*, 815 F.3d at 562 (citing 16 U.S.C. § 1533(b)(2)).

## II.  The ESA Does Not Require Consideration of Foreign Conservation Efforts When Designating Critical Habitat, and the District Court Erred When It Imposed This Requirement

The ESA does not require NMFS to consider foreign efforts to conserve ringed and bearded seals prior to designating occupied critical habitat. *See* Ctr. First Br. 32–37. In arguing otherwise, Alaska ignores the plain language argument the Center made in its opening brief. Instead, Alaska perplexingly accuses the

Center of attacking a "strawman" given the district court supposedly "did *not* rule that the ESA contains a mandatory requirement to consider habitat in foreign countries or that foreign efforts to conserve species must always be considered" in designating critical habitat. AK Br. 54, 55. But that is exactly what the district court held. The district court explicitly determined that NMFS "is required to consider foreign nation efforts when designating critical habitat." 1-FER-009.

In reaching this conclusion, the district court relied on the requirements for when NMFS is making a *listing* decision, i.e, "those efforts, if any, being made by any State or foreign nation … to protect such species," 1-FER-010 (alteration in original) (quoting 16 U.S.C. § 1533(b)(1)(A))—a standard conspicuously absent from the requirements for critical habitat designations, *see* 16 U.S.C. § 1533(b)(2). Courts "cannot believe that Congress omitted" consideration of foreign conservation efforts in Section 4(b)(2) "simply because it wanted to save ink or assumed that regulators and interested parties would understand that the omission of the term was inconsequential." *City & Cnty. of S.F. v. EPA*, 145 S. Ct. 704, 714 (2025). Rather, courts must assume the omission was intentional. *See id.* (noting that "time and time again," the Supreme Court "has invoked th[e] canon" that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts

16

intentionally and purposely in the disparate inclusion or exclusion" (citations omitted)). The district court failed to do so.[5]

True, critical habitat designations help achieve the ESA's goal of recovering listed species. *See* AK Br. 53–54. But it does not follow that the designation of critical habitat therefore requires all the same considerations as the agency's decision of whether a species qualifies for listing in the first place. This is because "[i]n law, unlike religion or philosophy, there is nothing which is necessarily important or relevant." *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996). Rather, "[w]hether an agency has overlooked 'an important aspect of the problem' … turns on what a relevant substantive statute makes 'important.'" *Id*.

Here, Congress made foreign nations' "efforts … to protect [a] species" an important factor when NMFS is deciding whether it must *list* that species. 16

---

[5] Alaska also argues the district court correctly held that NMFS failed to consider an important aspect of the problem by neglecting to consider the fact that "there are large seal populations" outside of the United States. AK Br. 53. The district court's decision contains no such holding. *See* 1-FedER-007–010. As NMFS explained, issues "regarding abundance, distribution, and population trends are relevant to ESA listing decisions (and were addressed in the final rule listing the [species] …), but they do not have any bearing on whether critical habitat should be designated." 2-FedER-066, 123. And this Court has already overruled Alaska's objections to the listing of a species that is presently robust but threatened with extinction within the foreseeable future. *See Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 683 (9th Cir. 2016) (holding that NMFS "need not wait until a species' habitat is destroyed to determine" the species qualifies for listing); *see also Alaska Oil & Gas Ass'n v. Ross*, 722 Fed. App'x 666, 668–69 (9th Cir. 2018) (holding the Court's ruling for bearded seals also applies to ringed seals).

U.S.C. § 1533(b)(1)(A). Congress's omission of this factor in specifying what NMFS must consider *in designating critical habitat* means that Congress intended it *not* be treated as an important factor in such designations. *See id.* § 1533(b)(2); *see also* Ctr. First Br. 32–33.[6] But the district court made it one, thereby improperly "impos[ing] 'procedural requirements [not] explicitly enumerated in the [ESA].'" *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (second alteration in original) (citation omitted).

Moreover, the district court entangled its holding on this issue with its other improper holding that NMFS can only designate occupied critical habitat areas that are essential to the conservation of the species. *See* 1-FedER-008; *see also* AK Br. 53 (claiming that "NMFS failed to explain why the critical habitat was essential for each seal's survival and recovery"). But, as explained above, that is the standard for designating unoccupied habitat. *See supra* Argument Section I.A.; *see also* Ctr. First Br. 24–25 (explaining how the two standards are distinct and citing relevant cases). NMFS applied the correct standard: determining, in designating occupied habitat only, what areas contain the features essential to the ice seals' survival and recovery. *Supra* Argument Section I.A. That is all the ESA requires.

---

[6] Alaska's comments on the proposed critical habitat designations nowhere argued that NMFS had to consider foreign conservation efforts in designating such habitats, *see* AK-SER-003–025, bolstering the fact that consideration of foreign conservation efforts is not an important aspect of a critical habitat determination.

## III.    NMFS Properly Considered Economic Impacts

NMFS's economic impact analyses for the critical habitat designations and its decision not to engage in the ESA's discretionary process for considering exclusion of additional areas from the designations were both reasonable and satisfy the requirements of Section 4(b)(2). *Contra* AK Br. 59–67. Alaska's argument to the contrary seeks to impose an additional requirement on NMFS: to perform an exclusion analysis for the areas requested by Alaska and the North Slope Borough. The ESA contains no such requirement, and requiring NMFS to do so would be unworkable as a practical matter.

The first sentence of Section 4(b)(2), 16 U.S.C. § 1533(b)(2), requires NMFS to "consider" economic and other impacts when designating critical habitat, as it did here, Ctr. First Br. 37–39. Alaska does not point to any costs that NMFS failed to consider in its economic evaluations or explain how NMFS otherwise failed to "properly take into consideration" the impacts of the designations. AK Br. 66. Alaska also dismisses NMFS's qualitative assessment of the indirect benefits of critical habitat designation as "spurious" and "speculative," *id.* 60, 64, but Alaska has no support for these assertions either. And record evidence demonstrates that critical habitat designations benefit listed species. *See* CBD_SER-031–37 (study showing that species with critical habitat are more than twice as likely to be recovering as those without it). At bottom, Alaska's disagreement with NMFS's

19

economic analyses is a disagreement with the ESA's directive that NMFS designate critical habitat. *See* AK Br. 67 (claiming that "critical habitat should not have been designated in the first place").

The second sentence of Section 4(b)(2) lays out a discretionary process whereby NMFS *may* exclude certain areas after weighing the costs and benefits of doing so. 16 U.S.C. § 1533(b)(2) ("The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat ...."). Alaska argues that NMFS was required to weigh the economic costs against the benefits for each area that Alaska asked NMFS to exclude, but nowhere does the ESA mandate this approach.

In *Weyerhaeuser*, the Supreme Court was referring to this second sentence when it explained that "Section 4(b)(2) requires [NMFS] to consider economic impact and relative benefits before deciding whether to exclude an area from critical habitat or to proceed with designation"—a process the Supreme Court recognized was entirely discretionary. 586 U.S. at 12 ("The use of the word 'may' ... certainly confers discretion on the Secretary."). Therefore, the ESA *only* requires the weighing process if an agency decides to consider excluding a particular area—not for *all* areas of a potential designation. *See Bldg. Indus. Ass'n of the Bay Area v. U.S. Dep't of Com.*, 792 F.3d 1027, 1032–33 (9th Cir. 2015)

20

(Section 4(b)(2) "does not require the agency to weigh the economic benefits of exclusion against the conservation benefits of inclusion at the first step of the analysis.").

When an agency elects to go through Section 4(b)(2)'s discretionary exclusion process and evaluates whether to exclude an area from critical habitat, that decision is indeed reviewable under the Administrative Procedure Act. AK Br. 59 (citing *Weyerhauser*). But in the event the agency does *not* choose to go through the weighing process, the only judicially reviewable decision is whether the agency has "considered" the factors in step one, i.e., "economic impact, … national security, and any other relevant impact." 16 U.S.C. § 1533(b)(2). This Court has consistently found that NMFS (and FWS) have wide latitude in how these impacts are considered. *See Home Builders v. FWS*, 616 F.3d at 992 (rejecting industry demand for a cumulative assessment of economic impacts); *Bldg. Indus. Ass'n*, 792 F.3d at 1032–33 (rejecting industry arguments that to "consider" economic impacts, NMFS must weigh costs of designation against benefits).

Nor does the legislative history that Alaska cites support its position. AK Br. 58–59. Congress indeed added Section 4(b)(2) to provide greater flexibility in critical habitat designations by requiring consideration of economic impacts and allowing NMFS (and FWS) to elect to exclude areas after weighing the costs and benefits. However, the committee report "emphasizes that the weight given to any

21

impact is within [NMFS's] discretion and that [NMFS] is 'not required to give economics or any other "relevant impact" predominant consideration in … specification of critical habitat.'" *Bldg. Indus. Ass'n*, 792 F.3d at 1033 (citing H.R. Rep. No. 95-1625, at 17 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 9453, 9467).

And as a practical matter, the process that Alaska believes NMFS must follow—to weigh the economic impacts against the benefits of designation for every area that an interested party requests to be excluded from critical habitat—is unworkable. The ESA *permits* NMFS to exclude areas after a cost-benefit analysis, but it does not *require* such analysis simply because an interested party has requested an exclusion. *See* 16 U.S.C. § 1533(b)(2) ("[T]he Secretary *may* exclude any area from critical habitat …." (emphasis added)). If that were the case, requests for exclusion and resulting analyses would slow down the critical habitat designation process, undermining Congressional intent that critical habitat be timely designated. *See id.* § 1533(a)(3)(A)(i), (b)(6)(C)(ii) (requiring NMFS designate critical habitat concurrently with the listing of a species or within one additional year); Ctr. First Br. 4–7 (discussing importance of critical habitat). Such a delay would deprive listed species of important protections in the meantime and hamper the ESA's goal of recovering listed species. *See Jewell*, 815 F.3d at 550–51 ("The purpose of the ESA is to ensure the recovery of endangered and threatened

species, not merely the survival of their existing numbers." (citing 16 U.S.C. §§ 1531(b), 1532(3)).

Here, NMFS satisfied the requirements of the ESA. NMFS considered the economic impacts of the designations, including those areas around communities on the Beaufort Sea coast and North Slope Borough villages. Ctr. First Br. 39–41. As Alaska noted, NMFS found that because the critical habitat designations were not likely to result in significant project modifications, the economic impacts were low. AK Br. 63–64 (citing 2-FedER-039, 090). NMFS also concluded that the regulatory costs of designation were low because of the seals' existing baseline protections under the MMPA and ESA. 2-FedER-039, 090. NMFS further explained how the designations would benefit the seals, including informing government agencies and the public about the seals' essential habitat features and encouraging voluntary conservation measures. Ctr. First Br. 39 (citing 2-FedER-047–48, 101).[7]

In short, the language of the ESA is clear—designating critical habitat is mandatory, and before doing so, NMFS must "consider" relevant impacts of the designation. 16 U.S.C. § 1533(a)(3)(A), (b)(2). If NMFS elects to consider

---

[7] Alaska takes issue with NMFS's consideration of benefits, alleging the agency should have used the "baseline" approach to quantify benefits as it did for costs. AK Br. 65–66. But many of the benefits of critical habitat designation are described qualitatively, as permitted by regulation. 50 C.F.R. § 424.19(b).

excluding an area from the critical habitat designation, only then must it perform an analysis of the costs and benefits of the potential exclusion. *Id*. § 1533(b)(2). NMFS complied with the process here and this Court should uphold its economic evaluations under Section 4(b)(2).

## IV.    The ESA Does Not Require an Explicit Prudency Finding

The district court rightly rejected Alaska's argument that NMFS had to make an express determination that designating critical habitat for the bearded and ringed seal is prudent before designating such habitat, 1-FedER-011, and this Court should do the same. The ESA does not require an explicit "prudency determination" as a prerequisite to making a critical habitat designation, *contra* AK Br. 67–71, and here, the agency's decision leaves no doubt as to why it thought the designations were prudent.

Under the ESA, NMFS has a non-discretionary duty to designate critical habitat upon listing a species. 16 U.S.C. § 1533(a)(3)(A). Prudency is necessarily subsumed within any designation of specified critical habitat. As such, NMFS is only required to explain the prudency of its decision when it uses the "rare exception" to forgo designating critical habitat, not when it exercises its "statutory obligation" to designate. *See Nat. Res. Def. Council v. U.S. Dep't of Interior*, 113 F.3d 1121, 1126–27 (9th Cir. 1997) (evaluating whether FWS's explanation for

why designating critical habitat for the California gnatcatcher was not prudent and holding that explanation unlawful).

Here, NMFS expressly considered Alaska's concerns regarding the propriety of the designation and ultimately disagreed with them. The agency found that none of the offered reasons "fall[ ] within any of the … circumstances identified in … 50 C.F.R. § 424.12(a)(1) in which [NMFS] may determine a designation would not be prudent." 2-FedER-066, 123. NMFS explained, for example, that "areas within U.S. jurisdiction provide more than negligible conservation value" for the species and that "the threats to the essential features of [the seals'] critical habitat do not stem solely from causes that cannot be addressed through management action." 2-FedER-066, 123. NMFS clearly set forth its reasons for rejecting Alaska's objections and thoroughly detailed why the designated areas contain features essential to the species' conservation. Nothing in the ESA requires NMFS to do more.

In arguing otherwise, Alaska fundamentally misconstrues the ESA and its implementing regulations, which emphasize the non-discretionary nature of critical habitat designations. The ESA states, "to the maximum extent prudent and determinable" NMFS "*shall*, concurrently with [listing a species] … designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i) (emphasis added). It further states that "[a] final regulation

designating critical habitat … *shall* be published concurrently with the final [rule listing a species], unless [NMFS] deems that … critical habitat of such species is not then determinable." *Id*. § 1533(b)(6)(C)(ii) (emphasis added). If it is indeterminable at listing, NMFS can invoke a one-year extension, but by the close of that additional year, it "*must* publish a final regulation based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat." *Id.* (emphasis added). Congress's use of "shall" and "must" demonstrates its intent to make designating critical habitat mandatory. *Bennett v. Spear*, 520 U.S. 154, 172 (1997) ("[T]he terms [for critical habitat designations] are plainly those of obligation rather than discretion.").

This statutory language and its mandatory nature are echoed in the ESA's implementing regulations. 50 C.F.R. § 424.12(a). The regulations further specify the limited circumstances under which NMFS may find a designation is not prudent. *See id*. § 424.12(a)(1) (NMFS "may, but is not required to, determine that a designation would not be prudent" in some situations, such as when the designation might increase threats to the species.). And, in keeping with the ESA's mandate, this Court has consistently held that critical habitat designation is mandatory. *See, e.g.*, *Jewell*, 815 F.3d at 555 (Listing the polar bear meant FWS "*was required to designate* … critical habitat." (emphasis added) (citing 16 U.S.C. §§ 1532(5)(A)(i), 1533(a)(3)(A)(i))); *Ctr. for Biological Diversity v. U.S. Fish &*

*Wildlife Serv.*, 450 F.3d 930, 935 (9th Cir. 2006) ("[C]ritical habitat designations are mandatory" and "must be made at the time a species is listed."); *Nat. Res. Def. Council*, 113 F.3d at 1124–27 (FWS "failed to discharge its statutory obligation to designate critical habitat."). Alaska does not, and cannot, point to any cases that indicate critical habitat designation hinges upon an explicit prudency finding. *See Nat'l Ass'n of Homebuilders v. Defs.*, 551 U.S. at 662–63 (holding that courts cannot read additional criteria into a statute).

Moreover, district courts have now twice rejected Alaska's argument that a critical habitat designation must contain an explicit "prudency finding"—in the decision below in the present matter and in the challenge to FWS's critical habitat designation for the polar bear. *See Alaska Oil & Gas Ass'n v. Salazar*, 916 F. Supp. 2d 974, 996 (D. Alaska 2013), *rev'd on other grounds*, *sub nom. Jewell*, 815 F.3d 544 (9th Cir. 2016). In that case, the plaintiffs argued that FWS "failed to make a prudency finding" before designating polar bear critical habitat, which the court found "unfounded and unconvincing." *Id*. The court could not "find a requirement in the ESA or in its [implementing] regulations that oblige[d] [FWS] to expressly find, and to so state in the Final Rule, that the designation was prudent from the outset." *Id*. "[P]rudency of a designation is implied," and an agency need only "expressly justify its actions when it finds designation to *not be prudent*." *Id*.; *see also* 1-FedER-011 ("declin[ing] to read into the ESA or its regulations a

27

requirement for an express prudency determination when making a critical habitat designation"). Likewise, NMFS's designations for the seals necessarily implied prudency and no express prudency determination was required.

Alaska points to the circumstances outlined in the ESA's regulations for when NMFS can find a designation not prudent as relevant "factors" for Alaska's supposed "prudency determination" requirement. AK Br. 70. But these circumstances are only relevant when NMFS makes the discretionary determination that critical habitat designation is *not* prudent. 50 C.F.R. § 424.12(a)(1). Here, NMFS addressed Alaska's prudency concerns, *supra* page 25, concluding that none of the proffered reasons justified a finding that designation would not be prudent. Further, because NMFS "may, but is not required to, determine that a designation would not be prudent" when the enumerated circumstances are met, NMFS retains discretion to designate critical habitat even in those limited scenarios. *Id*. In other words, these circumstances can only be used to justify "the rare imprudence exception," and have no relevance when NMFS designates critical habitat. *Nat. Res. Def. Council*, 113 F.3d at 1127.

Alaska's use of the 2019 amendments to the ESA's implementing regulations, AK Br. 68, is also misplaced. The section that Alaska cites is titled "Comments Regarding *Not* Prudent Determinations." 84 Fed. Reg. 45,020, 45,040 (Aug. 27, 2019) (emphasis added). In responding to comments, NMFS said it

"expect[s] to designate [critical habitat] in most cases" and that "Congress intended for [NMFS] to designate critical habitat except in those rare instances when critical habitat would not be 'beneficial to' or 'in the best interests of' the species." *Id*. at 45,040–41 (citing legislative history). Alaska's attempts to confuse the not prudent exception with its so-called prudency determination have no basis in the ESA or its regulations.

## CONCLUSION

For the foregoing reasons, and the reasons stated in the Center's opening brief, the Court should uphold NMFS's critical habitat designations in their entirety. Specifically, the Court should reverse the district court's determinations that, when designating occupied critical habitat for the seals, NMFS was required to (1) make a finding that the specific areas are essential to the respective species' conservation, (2) consider the conservation efforts of foreign nations, and (3) consider whether to exclude additional areas; and the Court should affirm the district court's determination that NMFS is not required to make a prudency determination when designating critical habitat. The Court should remand to the district court for entry of judgment in favor of NMFS and the Center, thereby restoring critical habitat protections for bearded and ringed seals.

Respectfully submitted on June 27, 2025,

/s/ *Kristen Monsell*
Kristen Monsell
Emily Jeffers
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7100
kmonsell@biologicaldivesity.org
ejeffers@biologicaldiversity.org

Marlee Goska
Center for Biological Diversity
P.O. Box 1178
Homer, AK 99603
(907) 931-4775
mgoska@biologicaldiversity.org

*Attorneys for Intervenor-*
*Defendant/Appellant/Cross-Appellee*
*Center for Biological Diversity*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with word limitation of Ninth Circuit Rule 28.1-1(b) because it is a cross-appeal brief containing 6,977 words, excluding the parts of the brief exempted under Fed. R. App. P. 32(f).

Dated: June 27, 2025
                            /s/ *Kristen Monsell*
                            Kristen Monsell

                            *Attorney for Intervenor-Defendant/Appellant/Cross-Appellee Center for Biological Diversity*